Please proceed. How do I say your name, Counsel? It's Green, Your Honor. Green? Green. Very good. Please proceed. So I'm Jack Green, Carter-Ledy DeMilburn, representing Agilent. I'm here with my colleague Ted McDonough, as well as representatives from Agilent, Hing Hong, and Rick Rickfors. We're pleased to present an argument on an appeal from the board on an inter-parties re-examination. This re-examination was instituted by the predecessor, my client, several years ago and has now reached this court. The first issue I'd like to address today is Agilent's standing as third-party requester. This was an issue raised by Waters in motion practice and this court directed us to address it in our briefs. Can I just ask you, do you or do you not dispute that if Agilent had purchased Aurora completely and Aurora had disappeared so that it was a successor in that interest, in that sense, that the statutory right of action would apply to Agilent? Yes, Your Honor. We believe that if Agilent had bought Aurora as a company, certainly we would have standing here. We believe the same principle applies in this case, which was an asset purchase in which the agreement expressly assigned all of the business, including the rights and re-examination, including the liability for any infringement that might arise from infringement of the patents. What do you think is necessary to extend the literal third-party requester to some other legal entities? Successorship or what? Not just kind of assignment of the right in the proceeding, I assume. Well, Your Honor, that's a good question. I think that it requires a binding legal document assigning the rights. What rights, I guess, is the question? Well, the rights arising from the business, which include the right to bring a re-examination. Did the document actually refer to the re-examination? It did, Your Honor. So why is it that Aurora continued to participate in the re-examination without Agilent for a substantial period of time? I believe that that was simply so that legal knowledge and strategies could be transitioned among counsel. And then when Agilent was ready to fully take over the re-examination, they submitted a document which indicated that the real party in interest was Agilent. And do you think that Aurora would have appealed as the third-party requester? No, Your Honor. Why? Because the document that they signed, the asset purchase agreement, assigned all of the rights in re-examination together with the litigation that gave rise to the re-examination. And so they were no longer an interest department. Do you believe that jurisdiction would exist if all you had purchased were the rights to pursue the re-exam short of the rest of the business assets associated with this division? Your Honor, I haven't tried to consider that particular factual question. But I think in this case, everything has come to Agilent. And so it's clear that there's standing. They still exist. So what do you mean everything has come to Agilent? Well, it was an asset purchase agreement of substantially the entire business. And the Tang Declaration establishes that there was an assignment of all of the rights incident to that business, including all liability, including all rights to bring legal claims relating to the business. And we think that this is one of those points. You answered me before that said that there was a year delay in Agilent even participating because there was something to do with the transition of counsel. But isn't there a big difference? If you said that Aurora had no right to even engage in activities relating to the re-exam or litigation relating to the re-exam, then how could Aurora continue to do that regardless of whether you felt like using the same counsel? Your Honor, my understanding is that Agilent bought the business, assumed direction of the case. The same lawyers remained involved. I don't know. But it was Aurora that was participating, though. Agilent's name doesn't show up for over a year, right? Well... And Aurora continued to participate even when Agilent became involved. Aurora still filed briefs and still participated. Their name was still on all of the proceedings. Yes, Your Honor. I believe Aurora's name... It was a separate entity. It is a separate entity. Its name was on the proceedings. But my understanding is that Agilent assumed control over the re-examination and had the legal interest in that re-examination from the time of the purchase. So is it your view that it was improper for Aurora to continue to participate then at that point? Because only one person can be the third-party requester. You can't have two. And yet you tag-teamed below with the board. So is it your view... Look, either Agilent's improper under your theory of transfer of control or Aurora's improper. So is it your view that it was improper for Aurora to continue to participate at that stage in the proceedings? Well, no. I apologize if I misspoke. I see it more as a... You have to look at this realistically. There was a realistic transfer of responsibility from Aurora to Agilent. And today, when we're looking at the right to appeal here, I think it's clear that Agilent is the party requesting re-examination. But Aurora's name is in the board decision. Aurora's name is on the caption. And Aurora's name is in the list of parties at the end of the board decision. Are you telling us that we shouldn't look at the statute to see what the scope of our jurisdiction is? We should let Agilent decide. Well, no. You have to look at the statute. But what I'm saying is that in the context of the statute, when you look at the party requesting re-examination, that that party today is Agilent. During the period of transition from Aurora to Agilent, it may have been both parties. But both parties are the ones here today seeking appeal from the board decision. That's part of the problem, right? where they were clear the real party in interest is Agilent. And this was before the proceedings got to the board. That it's very common in both board proceedings, as well as in district court litigation, for there to be a transition over time as responsibility is... filed your own third party request as Agilent. Couldn't you have? Well, I would say that once Agilent purchased the business, it was no longer an assumed assignment of the re-examination rights. It was no longer in a position to file its own request for re-examination. But what about the first option? Is there a procedural mechanism by which, before the board or in the PTO, you could have requested substitution of Agilent for Aurora as the third party requester? Well, we think that filing the document indicating who the real party in interest was... I know you think that that's sufficient. I guess I'm asking a question. Is there a written down procedure by which a formal substitution can occur? I'm not aware of a written down procedure for substituting parties. You could, of course, substitute counsel. But my understanding is that from the moment of assignment, Agilent assumed legal control and responsibility and liability and became the party requesting re-examination. And that gives us standing. And any distinction, perhaps, between who the third party requester was and is didn't have any legal bite until the moment it became necessary to invoke 134C? Yes, Your Honor. Do you want to turn to the mayor? Yes, Your Honor, if I may. I'm going to focus my time today on the construction of control, which is dispositive on this appeal. We, of course, continue to press our position on claims 12 and 13, but I think those are well stated in the briefs and do not need to be reached if this court reverses the board's construction of control. Now, of course, we are looking at the broadest reasonable interpretation of the term control, which appears in the phrase control the pressure drop across the restrictor. We have to look at the entire ordinary meaning of that word. Control is an ordinary word. And below, Waters submitted a dictionary definition. And now on appeal, we've submitted the complete dictionary definition, which we believe makes it clear that control has a broad meaning. Doesn't the specification, though, equate control with regulate rather than shutting off? The specification, in part, uses the word regulate when they're talking about the same structure that the claim uses the word control. We think that that difference in words means control should be given a broader meaning. But isn't the whole point of the patent, as you mentioned, as laid out in the specification, to have a constant, consistent flow? Isn't that what is going on here? I would say that's the primary goal. But when you look at the operation of the differential pressure transducer, which is the part of the claim that's controlling the pressure drop, that differential pressure transducer has a further function beyond that. And that function, I think, is in part to protect the system from overpressure caused by operator malfunction or a system problem. And that's the point the examiner recognized when it applied Asimov as an anticipation reference in combination with some of the secondary references. And so what we would urge is that this court look at control in the broadest reasonable interpretation. Look at the claim language, which does not include any language that further defines control in the way that the board did. We think the board effectively imported this goal from the specification in order to limit the meaning of control in a way that wasn't proper. Because under BRI, you have to look at the claim language, apply it as is, unless the specification really requires a further limitation. Well, but that's actually what the board found, right? I mean, I think the board at least believed it wasn't importing a limitation. The board believed that everything about the specification related solely to regulation. And we think that was error. On the de novo review, if you look at the specification, the specification expressly teaches this risk of overpressure caused by the system. And the specification doesn't explain any way to control or guard against that overpressure situation. And that's why we look at Asimov, which is analogous art, according to the board's finding. Both of them deal with pumping liquids and gases under high pressure. And the logical response to an overpressure situation is to cut off the system. It protects the system, and it also protects the integrity of the results. So the specification language that I'm referring to specifically is at column 7, lines 23 to 25. It's referred to in our brief. And we think that the board didn't address this language. And when you look at the specification as a whole, you don't see any requirement that the regulation occur only during the operation of the system. And that is effectively what this claim construction requires. The definition of control was not really disputed before the examiner. The examiner applied this definition in a way that seems quite logical to us, given that this is a system in which a pump is being used. And if a pump has a problem, the logical thing to do to control the pressure drop and protect the system is to shut off the flow. What's the best place in the specification for the proposition that one of the functions of this component is to protect the system either full stop or by shutting off? Well, I would point to the language that I just did at column 7, lines 22 to 25. And where does it actually say anything about shutting off? Well, there is more language that refers to a servo mechanism, and that's at column 7, lines 61 to 65. And the exact operation of that servo mechanism is nowhere specified, and that's important, we believe. Because under BRI, if the specification doesn't explain something, you have to apply the broadest reasonable interpretation. I see that I am almost out of time. Okay, we'll let over here from Mr. Belt, and we'll restore two minutes of your rebuttal time. Thank you. Good morning, Your Honors. I'm Eric Belt of MacArthur and English. I represent Waters Technologies. I'd like to begin, if I may, with the jurisdiction question. I think that the single most important factor, which I think you've all picked up on, is that after the transaction in August of 2012, Aurora continued to exist. It continued to participate. It continued to file third-party comments. Why is that the single most important consideration? I mean, you don't, I gather, dispute that the right kind of successor would be the third-party requester, even if that's a different legal entity from the one that filed the request. If Aurora was swallowed up lock, stock, and barrel. But where does that distinction come from? I mean, I guess this is what I'm stuck on. It seems to me there's a pretty natural concept here of successorship. A slightly fuzzy concept, but this one seems to be well within it, and that concept doesn't require the disappearance of the first legal entity. There are asset purchases, and if they're sufficiently complete, then there's a successorship, even though the original entity continues to exist. Yeah, but not only did they continue to exist, Your Honor. They continued to participate. But why does that matter? Because that means they could have appealed. They existed, they were participating, they were at the board hearing. But we don't know that. Why shouldn't I assume that they could not have appealed? Because actually, the moment that any of this mattered, which is the appeal time, it didn't matter what was happening before the board until then, because the statute didn't come into play. At that moment, Aurora has zero interest in this proceeding. They might even lack constitutional standing. No, they're still in the litigation, Your Honor. There is pending litigation. So they have Aurora in Delaware. Even though Agilent had assumed all liabilities as well as control of the litigation. Aurora had not. There was no substitution of parties in the case. As a matter of fact. But why isn't that just a formal matter? I mean, if Aurora had filed here and Agilent had not, I'm a little hard-pressed to see how you wouldn't have had a pretty strong argument, which you probably would have wanted to make, that Aurora could not in fact bring this challenge. It had no, maybe not even a constitutional standing, but in any event, it wasn't the real party in interest anymore. Yeah, I disagree, Your Honor. I think that it would have had a constitutional standing if you're talking about like the Consumer Watchdog case. Because it was actually sued in the litigation and it continued to be a party in that litigation. And let me tell you this one fact. After the purchase agreement, after we got wind of it, we, in the litigation, we sent some interrogatories to Aurora and we said, tell us about this transaction. We need to know, are you the right party? Is Agilent the right party? Because then we need to amend our complaint or substitute parties, whatever. Aurora sent back an interrogatory, sworn interrogatory, saying that Aurora responds that the transaction was an asset purchase following the acquisition. Aurora remains a corporation under the laws of the state of Delaware. That's at page 1228 in the appendix. So it might in fact have had, as you I think are suggesting, a continuing potential liability, even though Agilent assumed the liability. Agilent maybe might have gone bankrupt and then Aurora would have been on the hook. Well, there were excluded assets as far as we know, because we haven't seen the whole document. We think that there's some game playing here. We sought to add Agilent to amend our complaint and the parties opposed that motion. Now, we won the motion, but that tells me that Aurora still has some interest here. They clearly did, because if they hadn't any more interest, they would have gone like this and would have sought to withdraw from the litigation and sought to have withdrawn from the co-pending reexamination. Why would they even need to participate if they didn't have some sort of interest? I assume that there was a substantial period of time or at least some period of time where you were alleging infringing activities by Aurora before the asset purchase. Yeah, so we sued Aurora in the fall of 2011. The request for reexamination was filed in March of 2012 and the asset purchase was August 24th, 2012. So, yes, there was a period of time. And even after that asset purchase, the case wasn't stayed until January of 2013. All through the fall, we were filing motions back and forth doing the typical things you do in litigation. That was Aurora that was participating in that. And Aurora, of course, in the pending reexamination was filing its third party comments and so forth. So I think that's why Aurora existed at the time. And because they existed, they had an interest, they were on the hook in the litigation potentially. Does the agreement not exist in this record, the transfer agreement of assets? No, it doesn't. We asked for it in the litigation. They didn't give it to us. They said, no, you don't need that. All they did was say it was an asset purchase. What we know about it is that interrogatory answer doesn't exist in this case. We also have the Tang Declaration submitted to us, which has at least some block quotes. Yeah, isn't that interesting that it's only some parts of it and they didn't put in the whole agreement? I'd like to see the whole agreement. I don't know what's in there. But what we do know, what we can tell from the two or three block quotes there is that there were excluded assets. And we don't know what all the assets were that were purchased. Again, it would be nice to know. I think they were being coy here, and I think that they were playing games. I don't know why, but we shouldn't. I mean, I think that because of that, there's probably some interest or something that is going on. So Aurora easily could have filed the appeal here, and then I don't think we'd have this jurisdictional question. So... Can I just ask, do you view that as a jurisdictional matter? Why? Why are you using those issues, those terms interchangeably? This is all about the scope of 311. This 141 is one of them. It's at 315. It appears in a few places. Section 141 says the patent owner or the third-party requester may appeal. Section 315B of 35 U.S.C. 315B says it's the third-party requester who may appeal. So it's all over the patent code. And our... I don't know whether you can enlighten me on this, but our jurisdictional statute, which is 1295, that's the one that gives us jurisdiction. This stuff doesn't give us jurisdiction. It just provides various rights of action for appeal. Before it was amended, the relevant section simply said decisions of the board on applications and interferences. Re-exam, is that right? Of what statute? 1295. 1295. I didn't look at that, but that's actually very interesting. I don't know that... We had appeals on re-exam. We've had plenty of appeals, re-exams. This is a diversion, I'm sorry. Well, the diversions that I've been citing to, and I think opposing counsel has been citing to it, has been the pre-AIA versions of 141 and 315 and so forth. I just want to pick up on, before I leave this section and go on to control, I want to pick up on one thing that Judge Moore, I think, said. You used the term tag team. As a matter of fact, during the re-examination, it was never clear to us that Agilent was fully participating in this. I mean, it was always Aurora, Aurora's counsel, Ms. Lieberman was signing papers. They appeared, Aurora appeared at the board hearing in April of 2014. And it was never very clear to us why they were there. I don't dispute that they had a right to be there as a privy, but as a privy, and this might have been a question that Judge Toronto asked, they actually could not have become a third-party requester. I think they would have been barred. It's a mere privy, I think. There's a good comparative statutory argument that it's a mere privy, but that doesn't exclude being a particular kind of privy, namely an actual legal successor and interest to the one to whom you might be privy. And I think that the distinction would be, if you're looking for one, the case where Agilent ceases to exist. You mean Aurora ceases to exist. I'm sorry, Aurora ceases to exist. So in this case, there are some agreements back and forth that we don't really know what they are, but we don't have a situation in which they would be defined under Delaware law or any law as a successor and interest. As far as I know, that is correct, Your Honor. And do you believe that's because under Delaware law, the successor and interest, the party has to cease to exist? It's not enough if they divide off in its entirety, don't retain any assets, like a business unit, for example. Yeah, I think the case of a business unit, but again, we don't know what this transaction was. It's not in the record. So is really the issue here that we're unsure and that they haven't provided their obligation to establish jurisdiction? Well, they certainly have. And so is it the case here that they haven't met that obligation because what is clear from the record are some things were retained. We don't know what things were retained. And that's under the state law as a successor and interest. Is that really the right way to look at this case? I would say it slightly differently. Yes, they do have the burden. And yes, I think that Agilent or Aurora should have become more forthcoming in terms of what this deal was so that we would know. I needed to know, as lead counsel in the litigation below, what the actual deal was. And we needed to know, and you need to know. There's a distinction between privies and third-party requesters. And so now we need to figure out which of those two categories they fall into. Right, but I am pretty sure that Aurora remained the third-party requester and that all that Agilent was and ever was, was a privy or real party and interest. And the reason I think that's the case, Your Honor, is because if it truly was some sort of successor and interest, Aurora would have withdrawn. Yeah, Aurora would have withdrawn both from the litigation and from the reexaminations. And yet they continue to participate. I don't buy it that there needed to be a transition of counsel. That doesn't take eight months. I've transitioned into other cases before. That can't take eight months. It was eight months from August 24, 2012 when the transaction took place until April, I think it was 23rd or 26th. When 2013, eight months later, when Agilent finally filed that paper saying we'd like to be now the real party and interest. Can you remind me, how did this Tang Declaration come to us? Was there a motion practice? Yes, there was motion practice in front of a single judge, Judge Wallach. Who moved for what? We moved to dismiss the litigation, to dismiss this appeal. And then in response, Agilent submitted the declaration. That is correct. Did you have any opportunity for, let's call it discovery, to get the actual transfer of assets agreement? In this case, not in the litigation. Yeah, yeah, yeah. As far as I know, there's no discovery at this point. What we said in our reply when that was put in, we said we don't have the entire, we don't have the agreement. And under the best evidence rule, you can't even take that into consideration. So at that point, before Judge Wallach had issued the order denying and sending it up to this panel, I think that they very well could have, they being Aurora or Agilent, very well could have submitted some sort of surreply and submitted it. But in your reply, you objected to consideration of this. We did. We thought it was single-judge, but it was deferred by the motions panel to the merits panel. Correct. And I only say Judge Wallach because he was the one who signed the order. So can you, on the merits, why is the broadest reasonable, broadest reasonable interpretation one that excludes controlling the pressure drop by shutting it off when it reaches an unhappy level? Everything about the specification is about maintaining even flow. It's regulating. When you look at, I think it's the key passage there at column four, lines 24 to 42, I think Judge O'Malley picked up on that, the words regulate and control are used interchangeably in that same paragraph. And everywhere else in the specification, it's all about how do you maintain flow, precise flow, so that you're getting good results in the, not tainted results in the chromatography. There's no indication anywhere in the specification that the inventors were concerned with blowing up the test tubes. That's Asimov. Asimov was concerned with... Would this cover a situation in which the on-off switch said make it off if it's above this range, off if it's below this range, and that was a pretty compressed range. I'm trying to understand the difference between how precise, maintaining an even flow has to be. If it says, okay, if it fluctuates, whatever a little bit, we'll consider that even, and if it's outside that, off. Right, so when you look at the specification, if you understand what's going on here and you read Dr. Chorty's declaration, which by the way was unrebutted, there was no expert on the other side, it's all about how do you get results that are not tainted, and the way that in the past, in the prior art, what was tainting the results was these sort of wild oscillations in the flow rate. So the idea here is to get down to some sort of manageable level so that you're not getting starts and stops that would interfere with a mass spectrometer or whatever that you hook up to the chromatography lab equipment. So unlike, say, Asimov, which is concerned with do you want to flood a boiler that you're supplying oil to and you don't want to do that because then the whole thing blows up and your house blows up, that was Asimov. There's no indication here that a bunch of test tubes and columns on a lab bench that the inventors were concerned with shutting it down. In fact, shutting it down would actually be contrary to the whole purpose of this invention, which is to make sure that you get your results so that you can perform your drug discovery or blood analysis or whatever it is that you're using the equipment for. Just one more question. They don't cite it in the gray brief, so I'm not sure it's even that meaningful to raise something at this point, but at the bottom of column seven, there is a reference to a servo control system as it relates to the differential transducer being used as a mass flow transducer, and somehow your opponent is arguing that because it's not clear what that is, that by definition it might therefore be a shutoff valve. Yeah. No, I disagree because what it says there at the very last line here is that you're operating it, quote, and this is about line 64, in accordance with the requirements of the present invention. When you go back and look at what the requirements of the present invention, and it's all about maintaining this even flow to avoid all the fluctuations. So I don't understand how you can read that and say, well, it's about stopping it. So the servo there would have to be adjusting rather than simply sending a, please stop now. Oh, absolutely. It's adjusting so that you're, what's happening here in the system is that the pressure, this is highly compressible fluids that behave erratically. Fluids behaving badly is the way I like to say it. And the whole idea is you want to do something that is taking into account all of these, the state is changing, you have pressure and temperature changes. You want to keep adjusting it as it's going along to account for those pressure changes and so forth. That's really the idea here. Okay. Thank you, Mr. Felt. Thank you, Your Honors. We have two minutes of rebuttal, Mr. Green. Thank you, Your Honors. I have to remind the board this is a broadest reasonable interpretation. Can I ask you about the threshold question? I'm sorry. The point that I guess I'm fixing on now is the fact that Aurora remains a defendant in the district court litigation with potential liability at least if Agilent, which has agreed to assume our liability, goes bankrupt. Your Honor, the case... That makes them a real entity with a real interest in the dispute. I mean, respectfully, Your Honor, I would say no. The case below has stayed. There's been no opportunity for Aurora to formally withdraw. But is it true that you objected to adding Agilent as a defendant? I wasn't below Agilent. I don't know for sure. But my understanding is that the document that is quoted in detail in the Tang Declaration makes it perfectly clear that Agilent has... Why didn't you submit the whole document when there was an argument made that this wouldn't be the best evidence and that the court shouldn't consider it and we still haven't made a determination as to whether we could consider it? Why didn't you submit the whole document? Well, because it includes financial terms and we thought for purposes of the jurisdiction... But we're just supposed to trust you that certain things are all we need to know. I apologize. We're happy to submit the whole document if you have any doubt about this. But I take exception to counsel's suggestion that they objected to the Tang Declaration in reply on the motion because they didn't. The evidentiary objections only come up now. Well, put aside the evidentiary objections. The excerpts leave maybe not a lot of questions, but at least some because of the excluded assets language. Well, actually, if you read the Tang Declaration and you read the quoted language, it's very clear that the assigned assets include the business and the reexamination and the liability. There's no definition of business. Well, the business is substantially all the business of Aurora. You're making a lot of representations here anywhere in the record. That's part of the problem. Well, we were taken by surprise that this was a real issue on appeal here. And we put in the Tang Declaration to try to make it very clear that there was nothing mysterious going on here, that this had been a complete asset purchase and all the reexamination rights had been assigned. When we didn't get an objection to the Tang Declaration on the motion, we thought that it was sufficient evidence of that underlying legal fact. So as a matter of state law, I don't believe there's any doubt that Agilent is the successor in interest and that the right of a third-party requester to appeal to this court can be assigned as part of the business and that Agilent is the only party that has that right. What is your best site under Delaware law for why Agilent or under any law for why Agilent is clearly, unquestionably, in your view, the successor in interest? That is a legal test under state law. We don't have a lot of experience in it. I can't be nearly as certain as you. So what is your best site for why that's true? Your Honor, if it's permissible, I'd like to submit a letter with my best site. I don't have that now. But I would refer the court to the cases we cited permitting the transfer of legal rights under other statutes in litigation. You can transfer defenses. You can transfer claims. Would that fall... If all you did was transfer defenses and claims, would that put you in the privy category as opposed to the successor in interest bucket? I think that would be a privy and not a successor in interest. Right. And so you see, for us, the difficulty is the statute distinguishes between privies and third-party requesters who I would assume a successor in interest would be treated as a third-party requester, but a privy would not because the statute draws that distinction. That's our position, and we tried to make this clear in the papers. And I urge you to read the papers because we try hard to explain how all of the liability and rights are assigned. We are a successor in interest. The right of a third-party requester can be assigned using a legal document like this, and that gives us standing to appeal here. Your opening brief, you actually describe Agilent as a privy, and you actually make a privy argument, and you say Agilent is a privy. Right now you're saying you concede that if you only fell in the privy bucket that you wouldn't be a third-party requester. So which is it? It's successor in interest, third-party requester. We use this language, privy, in order to try to convey this legal right, but once we started briefing this, it became clear that our standing is based as a successor in interest. Okay. Thank both counsel for their argument. It's been very helpful. Let's move on to the next case.